**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**BSC ASSOCIATES, LLC,**

                                                    **Plaintiff,**

           **vs.**                                                    **3:14-cv-00645**
                                                                      **(MAD/DEP)**

**LEIDOS, INC.,**

                                    **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**HINMAN, HOWARD**                            **ALBERT J. MILLUS, JR., ESQ.**
**& KATTELL, LLP**
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, New York 13902-5250
Attorneys for Plaintiff

**SHEPPARD MULLIN**                           **KEVIN R. PUVALOWSKI, ESQ.**
**RICHTER & HAMPTON LLP**                     **RENA ANDOH, ESQ.**
30 Rockefeller Plaza
39th Floor
New York, New York 10112-0002
Attorneys for Defendant


**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

        On April 18, 2014, Plaintiff commenced this action in New York State Supreme Court,

Broome County, alleging that Defendant failed to pay licensing fees for the use of flight simulator

software provided to Defendant by Plaintiff's predecessor-in-interest, Binghamton Simulator

Company, Inc. ("Binghamton Simulator"), as was required by a subcontract between Binghamton

Simulator and Defendant.  Plaintiff seeks monetary damages.  *See* Dkt. No. 1 at 7-13.[1]  Defendant

removed the action to this Court on May 30, 2014.  *Id.* at 1-4.  Presently before the Court is

Defendant's motion to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and

12(b)(6) or, in the alternative, to compel arbitration.  Dkt. No. 4.  Plaintiff has opposed the

motion.  *See* Dkt. No. 9.

## II. BACKGROUND[2]

At an unknown point in time prior to April 21, 2010, Defendant agreed to design and

manufacture a helicopter flight simulator for the U.S. Army.  *See* Dkt. No. 5 at ¶ 5.[3]  Pursuant to

that agreement, Defendant and Binghamton Simulator entered into a subcontract agreement

effective April 21, 2010 (the "Subcontract"), in which Binghamton Simulator agreed, *inter alia*,

to provide Defendant with previously developed flight simulator software (the "Software").  *See

id.* at ¶¶ 8-9.

Binghamton Simulator developed certain portions of the Software under the U.S.

Government's Small Business Innovation Research ("SBIR") Program and developed other

portions entirely at its own expense.  *Id.* at ¶ 9.  The Software consisted of twelve modules.  *Id.* at

¶ 12.  Two of the Software modules were developed pursuant to the SBIR Program and were

therefore entitled to certain intellectual property rights and protections.  *Id.* at ¶ 13.

--------

[1] In order to avoid confusion, the Court's references to specific page numbers for entries on the docket will cite to the page number assigned by the Court's electronic filing system.

[2] The factual background is taken from Plaintiff's amended complaint and is presumed true solely for the purposes of this motion.

[3] At the time of the agreement, Defendant operated under the name "Science Applications International Corporation."

The Subcontract contained a provision on intellectual property rights, which provides as follows:

> Notwithstanding, any other provision herein, Buyer and Seller shall each retain ownership of, and all rights, title and interest in and to, their respective, pre-existing Intellectual Property. This subcontract will incorporate the standard DFARS clauses regarding rights in Intellectual Property to include technical data and computer software.

> The Seller agrees that it will provide the government with Unlimited Rights in all technical data, computer software (including source code), and computer software documentation that is developed under the NCM3 Program. The Seller further agrees that all technical data, computer software, and computer software documentation delivered under this Agreement and not described below shall be delivered with Unlimited Rights as that term is defined at DFARS clause 252.227-7013 and DFARS clause 252.227-7014.

> Any previously developed technical data, computer software, or computer software documentation developed by the Seller with mixed funding, including any and all legacy system intellectual property developed by the Seller with mixed funding, will be provided to the Government with not less than Government Purpose Rights as that term is defined at DFARS clause 252.227-7013 and DFARS clause 252.227-7014. The Seller will try to secure the maximum level of rights for all intellectual property identified and acquired in performance of the NCM3 Program. The Buyer must approve any technical data, computer software, or computer software documentation that the contractor proposes to provide with other than Unlimited Rights. Technical data, computer software, and computer software documentation that the parties agree will not be delivered with Unlimited Rights must then be incorporated into this Agreement below. Specially negotiated license agreements must be attached to this Agreement by Supplemental Agreement.

Dkt. No. 5-1 at § 18.0.

Pursuant to the Subcontract, Defendant agreed to purchase single-use license pay royalties for the Software for each simulator unit at varying prices per unit. Dkt. No. 5 at ¶ 14. The license

fee per unit was set at $144,755 for the original unit, $124,200 for the second unit, and $90,000 for any subsequent units. *Id.*

Binghamton Simulator performed its obligations under the Subcontract for the first flight simulator unit, and Defendant paid the license fee of $144,755. *Id.* at ¶ 15. The parties subsequently amended the Subcontract to include a subcontract for a second simulator unit. *Id.* The second subcontract provided for a license fee for the Software in the previously negotiated amount of $124,000. *Id.* In or around August 2011, prior to completion of the second simulator unit, Defendant terminated the second subcontract for convenience. *Id.* at ¶ 16. Nonetheless, Defendant paid Binghamton Simulator the $124,000 license fee provided for by the second subcontract. *Id.* The funds used to pay the license fees for the first two simulator units originated with the U.S. Government. *Id.* at ¶ 17.

Defendant provided the U.S. Army with at least sixteen additional flight simulator units, each of which incorporated the Software. *Id.* at ¶ 18. Defendant failed to pay Binghamton Simulator license fees for the additional units. *Id.* The U.S. Army's position is that it acquired the Software in its entirety with "Government Purpose Rights" rather than SBIR rights, and therefore, the Government has refused to pay any further license fees. *Id.* at ¶¶ 19-20. Based on the Army's position, Plaintiff alleges that when Defendant delivered the Software to the Army as part of the flight simulators, Defendant failed to ensure that Binghamton Simulator's SBIR rights were recognized and protected. *Id.* at ¶ 21. In any event, Defendant refused to pay Binghamton Simulator any additional license fees. *See id.* at ¶ 20.

In January 2012, at a sale conducted by Binghamton Simulator's primary secured lender under Uniform Commercial Code ("U.C.C.") Article 9, BSC Partners, LLC ("BSC Partners") purchased all of Binghamton Simulator's personal and intellectual property, including the

Software and Binghamton Simulator's claims against Defendant. *Id.* at ¶ 22. In or around

February 2014, Plaintiff acquired the instant cause of action from BSC Partners. *Id.* at ¶ 23.[4]

On April 18, 2014, Plaintiff filed a complaint in New York State Supreme Court asserting

causes of action for breach of contract, unjust enrichment, and a violation of the Department of

Defense Supplement to the Federal Acquisition Regulation ("DFARS") clause 252.227-

7014(k)(2). *See* Dkt. No. 1 at 7-13. Plaintiff filed an amended complaint on June 27, 2014,

which omitted the claim related to Defendant's alleged violation of DFARS clause 252.227-

7014(k)(2). *See* Dkt. No. 5. Accordingly, only Plaintiff's breach of contract and unjust

enrichment claims remain.


## III. DISCUSSION

### A. Standing

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v.*

*United States*, 201 F.3d 110, 113 (2d Cir. 2000). A federal court's jurisdiction is limited by the

requirement that a plaintiff have standing to bring its claim. *Powell v. Am. Gen. Fin., Inc.*, 310 F.

Supp. 2d 481, 484 (N.D.N.Y. 2004). "To survive a defendant's Rule 12(b)(1) motion to dismiss

for lack of standing, plaintiffs 'must allege facts that affirmatively and plausibly suggest that [they

have] standing to sue.'" *Kiryas Joel Alliance v. Village of Kiryas Joel*, 495 F. App'x 183, 188 (2d

Cir. 2012) (quoting *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)

---

[4] The nature of Plaintiff's acquisition of the instant cause of action will be discussed in
detail *infra* at Section III.B.

(per curiam)).[5]  To establish standing, "[p]laintiffs must 'allege, and ultimately prove, that [they]

ha[ve] suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant,

and which is likely to be redressed by the requested relief.'"  *Id.* (quoting *Baur v. Veneman*, 352

F.3d 625, 632 (2d Cir. 2003)).  In evaluating such a motion, the Court "must accept all undisputed

factual allegations as true and draw all reasonable inferences in the light most favorable to the

non-moving party."  *Beede v. Stiefel Labs., Inc.*, No. 1:13-CV-120, 2014 WL 896725 (N.D.N.Y.

Mar. 6, 2014) (citations omitted).  However, the Court may also refer to evidentiary submissions

to the extent that such submissions dispute the allegations in the complaint.  *Id.* (citing *Robinson

v. Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001)).

Defendant argues that Plaintiff has not established standing to bring its claim because the

Subcontract contained an anti-assignment clause that prohibited Binghamtom Simulator from

assigning its rights under the Subcontract.  Under New York law, only the parties to and intended

third-party beneficiaries of a contract have standing to enforce the contract.  *Rajamin v. Deutsche

Bank Nat'l Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (citations omitted).  However, "[w]hen a

valid assignment is made, the assignee steps into the assignor's shoes and acquires whatever rights

the latter had," including the right to enforce the contract.  *In re Stralem*, 303 A.D.2d 120, 123

(2nd Dept. 2003).

The rule adhered to in New York as to contractual anti-assignment clauses is that "[w]ith

limited exception, contractual provisions prohibiting assignments are treated as personal

---

[5]  Defendant moved for dismissal based on Plaintiff's failure to establish standing under
both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Second
Circuit has held that "the proper procedural route [for standing challenges] is a motion under Rule
12(b)(1)."  *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d
Cir. 2006).  Accordingly, the Court will apply the legal standards pertaining to Rule 12(b)(1) in
evaluating Defendant's standing argument.

covenants." *Pro Cardiaco Pronto Socorro Cardiologica S.A. v. Trussell*, 863 F. Supp. 135, 137 (S.D.N.Y. 1994) (citing *Citibank, N.A. v. Tele-Resources, Inc.*, 724 F.2d 266, 268 (2d Cir. 1983); *Allhusen v. Caristo Constr. Corp.*, 303 N.Y. 446, 460 (1952)).  An assignment that violates a personal covenant prohibiting assignments gives rise to an action for damages against the assignor, but is enforceable.  *Id.* (citing *Citibank*, 724 F.2d at 268).  In order for an anti-assignment clause to deprive an assignee of its rights under the contract, the clause "must specifically use language to the effect that the assignee receives no rights from an improper assignment or that such assignment is void." *Wheelabrator Techs. of N. Am., Inc. v. Fin. Sec. Assurance of Okla., Inc.*, No. 88 Civ. 7623, 1990 WL 180552 (S.D.N.Y. Nov. 15, 1990); *see also Sullivan v. Int'l Fid. Ins. Co.*, 96 A.D.2d 555, 556 (2nd Dept.1983) (finding that a no-assignment clause was a personal covenant because it "contained no provision that the assignment made without . . . consent . . . should be void, nor does it provide that an assignee would acquire no rights by reason of any such assignment, nor does it provide that the contractor shall not be required to recognize or accept any such assignment" (citation omitted)).

Here, the anti-assignment clause provided as follows:

> This Subcontract is not assignable and shall not be assigned by [Binghamton Simulator] without the prior written consent of [Defendant].  Further, [Binghamton Simulator] agrees to obtain [Defendant]'s approval before subcontracting this order or any substantial portion thereof; provided, however, that this limitation shall not apply to the purchase of standard commercial supplies or raw material.

Dkt. No. 5-1 at § 5.0.  The clause lacks language declaring any resulting assignment void, providing that an assignee would receive no rights from an improper assignment, or providing that Defendant would not be required to recognize or accept an improper assignment.  In the absence of such language, the Court must find that the clause constitutes a personal covenant by

Binghamton Simulator against assignments and does not render all assignments of the Subcontract invalid.

Defendant correctly asserts that when an anti-assignment clause contains a "clearly stated intent to render [the assignor] powerless to assign, there [is] no need for the non-assignment clause to also contain talismanic language or magic words describing the effect of any attempt by the [assignor] to make an assignment." *C.U. Annuity Serv. Corp. v. Young*, 281 A.D.2d 292, 293 (1st Dept. 2001). However, Defendant's argument that the phrase "[t]his Subcontract is not assignable" communicates a clear intent that Binghamton Simulator was powerless to assign the contract is not supported by the relevant law. In each of the cases cited by Defendant in which the court found that a no-assignment clause invalidated all subsequent assignments, the relevant clause contained language expressly stating that the assignor had no power to assign the contract. *See id.* at 292 ("In the clause before us, the promisee did not merely agree that he would refrain from making an assignment; he agreed he was powerless to do so."); *see also Pacific Life Ins. Co. v. Rapid Settlements, Ltd.*, No. 06-CV-6654L, 2007 WL 2530098, *2 (W.D.N.Y. Sept. 5, 2007) ("[B]ased on the language of the contract itself under well-established New York law, the fact that it contains both the power and the right to assign makes such an assignment void. . . . I find the agreement . . . by its terms precluded [the assignor] from transferring[,] that she had . . . neither the power nor the right to do so, and therefore, such an attempt was void."); *Singer Asset Fin. Co. v. Bachus*, 294 A.D.2d 818, 819 (4th Dept. 2002) ("The structured settlement agreement provides that the periodic payments due [the assignor] 'are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge or encumbrance' . . . nor shall [the assignor] have the power to sell, mortgage or encumber same, or any part thereof, nor anticipate the same, or any part thereof, by assignment or otherwise.' . . . [The assignor] expressly, clearly,

and unequivocally surrendered not only the right but the power to assign his rights under the structured settlement agreement, and thus any attempted assignment of his rights under that agreement was effectively barred." (citation omitted)).

The anti-assignment provision at issue here contained no such express surrender of Binghamton Simulator's power to assign its rights under the Subcontract. Accordingly, Defendant has failed to show that the no-assignment clause falls within an exception that would permit the Court to depart from the rule adhered to in New York that such clauses are treated as personal covenants. Therefore, the anti-assignment provision in the Subcontract does not bar Plaintiff from bringing suit. However, Defendant has raised a second challenge to the validity of the assignment that the Court will consider below.

## B.   The Doctrine of Champerty

In Defendant's reply to Plaintiff's opposition to the motion to dismiss, Defendant raises the argument that Plaintiff's complaint should be dismissed because Plaintiff's acquisition of the instant cause of action violated the doctrine of champerty, as codified at Section 489 of the New York Judiciary Law. *See* Dkt. No. 13 at 8-11.[6] Section 489 provides in pertinent part that

> [n]o person or co-partnership, . . . and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon . . . .

---

[6] The courts generally decline to consider "arguments raised for the first time in reply . . . because the plaintiffs had no opportunity to respond to those new arguments." *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012); *see also Ditullio v. Village of Massena*, 81 F. Supp. 2d 397, 408-09 (N.D.N.Y. 2000) ("Defendant may not first raise arguments . . . in its reply papers because Plaintiff would not have a fair opportunity to respond."). Here, the Court permitted Plaintiff to file supplemental briefing addressing the champerty issue, and thus Plaintiff suffers no unfairness in the Court considering Defendant's champerty argument. *See* Dkt. No. 16.

N.Y. Judiciary Law § 489(1). The New York champerty statute exists "[t]o prevent the resulting strife, discord and harassment which could result from permitting attorneys and corporations to purchase claims for the purpose of bringing actions thereon." *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 329 (1971).

The "critical issue" in determining whether an assignment is champertous is "the purpose behind [the plaintiff's] acquisition of rights that allowed it to sue [the defendant]." *Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 198 (2009) ("*Love II*") (internal quotation marks and citation omitted). That is,

> the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim. What the statute prohibits . . . "is the purchase of claims with the 'intent and for the purpose of bringing an action' that [the purchaser] may involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up ... in [an] effort to secure costs."

*Id.* at 201 (citation omitted). Stated differently, "in order to fall within the statutory prohibition, the assignment must be made for the very purpose of bringing suit and this implies an exclusion of any other purpose." *Fairchild*, 28 N.Y.2d at 330. "Thus, 'if a party acquired a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation.'" *Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. v. Love Funding Corp.*, 591 F.3d 116, 121 (2d Cir. 2010) ("*Love III*") (quoting *Love II*, 13 N.Y.3d at 200). Although "[t]he inquiry into purpose is a factual one," *Love II*, 13 N.Y.3d at 200, courts have found the issue of champerty amenable to judgment as a matter of law where the facts concerning the assignment and its purpose are undisputed. *See, e.g., Love III*, 591 F.3d at 122-24; *Fairchild*, 28 N.Y.2d at 330.

In the present matter, Defendant argues that the transfer of the instant cause of action to Plaintiff violated the doctrine of champerty because Plaintiff "acquired from BSC Partners only a

naked transfer of the causes of action alleged . . . . Plaintiff expends great effort in its Opposition to state that it acquired only the rights to the causes of action, and not the obligations, such as the arbitration provision, pursuant to the Subcontract." Dkt. No. 13 at 10-11. Indeed, in Plaintiff's opposition papers, Plaintiff asserted that "BSC Associates did not assume the obligations of the Subcontract Agreement. It only purchased the causes of action previously owned by Binghamton Simulator." Dkt. No. 10 at 12. Plaintiff further asserted that "neither BSC Partners nor [Plaintiff] assumed the Subcontract Agreement itself." *Id.* at 13. Plaintiff additionally stated that "BSC Partners sold most of its assets to a different company, but conveyed the rights to the claims asserted in this action to [Plaintiff]." *Id.* at 6 n.1.

In light of Plaintiff's representations that the sole item Plaintiff acquired in the assignment from BSC Partners was the instant cause of action, as well as the sparsity of facts in Plaintiff's amended complaint pertaining to Plaintiff's acquisition of its claims, the Court requested that Plaintiff file a supplemental brief "addressing the manner in which it acquired the causes of action it asserts, the purpose of its acquisition, and the basis for its standing to pursue its claims." Dkt. No. 16.

In its supplemental brief, Plaintiff explained that in January 2012, Binghamton Simulator's primary lender initiated a U.C.C. Article 9 sale, at which BSC Partners acquired all of Binghamton Simulator's assets. *See* Dkt. No. 17 at 4. Plaintiff contends that BSC Partners "fully intended to pursue the claims against [Defendant]" and corresponded with Defendant and the Army regarding the claims throughout 2012, 2013, and early 2014. *Id.* at 5. In late 2012, BSC Partners entered into an affiliation with Kratos Defense & Security Solutions, Inc. ("Kratos"). *Id.* BSC Partners later agreed to sell its assets to Kratos, and in March 2014 Kratos acquired BSC Partners as an entity. *Id.* Prior to the consummation of the sale, in February 2014, members of

BSC Partners "formed Plaintiff to take title to" assets that were to be "carved out of the sale to Kratos," including the claims against Defendant and the Army, "product lines [other than BSC Partners' helicopter aircrew training product line], relocation assets, and certain intellectual property." *Id.* Plaintiff provided no consideration for the aforementioned assets, but rather "retained those assets." *Id.* at 5-6.[7] Thus, Plaintiff argues, "although the entities have changed, the claims at issue here have always been owned by entities controlled by the Matthews family," the family which owned Binghamton Simulator and BSC Partners, and now owns Plaintiff. *Id.* at 6.

Defendant argues that Plaintiff's own admissions show that "the claims [Plaintiff] now seeks to bring were intentionally separated from the underlying contract at issue and transferred to a separate entity, *i.e.*, Plaintiff, specifically so that Plaintiff could sue on those claims." Dkt. No. 19 at 4. Defendant argues that Plaintiff has therefore admitted that its purpose in obtaining the claims was to initiate litigation and that this purpose demonstrates champerty. *See id.* Plaintiff argues that its acquisition of the claims was not champertous because "BSC Partners acquired the claims as incidental to its acquisition of Binghamton Simulator's assets," while "[Plaintiff] only 'acquired' the claims in a technical sense." Dkt. No. 17 at 7. Plaintiff urges the Court to view the transfer of the assets to Plaintiff as "the Matthews family [having] retained the claims . . . using a new entity that it formed as part of the [sale] of BSC Partners to Kratos." *Id.*

First, to the extent that Plaintiff is arguing that Plaintiff had a preexisting proprietary interest in the subject of this cause of action, and thus did not commit champerty, Plaintiff's

---

[7] The Court notes that despite being asked to address the manner in which Plaintiff acquired its claims, Plaintiff failed to specify how Plaintiff took title to the claims from BSC Partners. Plaintiff's contention that it "retained" the claims when Kratos purchased BSC Partners is nonsensical, as the word "retain" suggests prior ownership, and the claims were then owned by BSC Partners, not Plaintiff.

argument is unavailing. In *Love II*, a plaintiff trust purchased a loan from financial services firm USB's predecessor-in-interest, which had purchased the loan from the defendant, Love Funding Corporation ("Love"), pursuant to a loan purchase agreement. 13 N.Y.3d at 195-96. When the loan defaulted, the plaintiff commenced litigation against USB. *Id.* at 196. As part of a larger settlement, the plaintiff agreed to release its claim against USB as to the loan in exchange for USB assigning its rights under the loan purchase agreement with Love to the plaintiff. *See id.* at 196-97. When the plaintiff sued Love under the loan purchase agreement, Love asserted a champerty defense. *Id.* at 197. In response to a question certified to it by the Second Circuit, the New York Court of Appeals explained that "if . . . the [plaintiff's] purpose in taking assignment of USB's rights under the Love [loan purchase agreement] was to enforce its rights," then the assignment did not violate the doctrine of champerty as a matter of law, "given that the [plaintiff] had a preexisting proprietary interest in the loan." *Id.* at 202. Upon review of the Court of Appeals' opinion in *Love II*, the Second Circuit concluded in *Love III* that because "undisputed evidence establishe[d] that . . . before the challenged USB assignment, the [plaintiff] had a significant interest in the repayment of the [loan]," the assignment was not champertous. *Love III*, 591 F.3d at 122.

Here, Plaintiff – which did not exist prior to February 2014 and was formed solely to "retain" this cause of action from BSC Partners – clearly did not have a proprietary interest in the Subcontract underlying this action that predates the transfer of claims to Plaintiff. Plaintiff has repeatedly asserted that it was a stranger to the Subcontract and never assumed the Subcontract itself. *See, e.g.*, Dkt. No. 10 at 12-13. Furthermore, Plaintiff has identified no legal mechanism that would permit the Court to disregard Plaintiff's form as a distinct legal entity in order to find that Plaintiff had a preexisting interest in the Subcontract because the entities that previously

owned the Subcontract were owned and managed by Plaintiff's current owners and managers.[8] Unlike the plaintiff in *Love II* and *Love III*, which was the end holder of the defaulted loan and thus injured by the loan's default, Plaintiff suffered no damages as a result of Defendant's alleged breach of the Subcontract. The Court therefore finds Plaintiff's preexisting interest arguments unpersuasive.

Second, Plaintiff's argument that it acquired the claims incidentally to its acquisition of operating assets from BSC Partners is also unpersuasive. In *Fairchild*, the New York Court of Appeals concluded that an assignment of a claim did not violate the doctrine of champerty where the assignment was "an incidental part of a substantial commercial transaction" in which the plaintiff acquired the assignor's operating assets. 28 N.Y.2d at 330. Key to the court's analysis was the fact that the plaintiff's primary purpose in effectuating the transaction was to acquire the assignor's operating assets and not to bring an action on the assignment. *See id.* Plaintiff points to this case and asserts that "*BSC Partners* acquired the claims as incidental to its acquisition of Binghamton Simulator's assets." Dkt. No. 17 at 7 (emphasis added). Although this appears to be true as to BSC Partners, Plaintiff amended its complaint specifically to "correct" its factual contention in the original complaint that Plaintiff purchased Binghamton Simulator's assets, including the Software, from BSC Partners, and clarified that in actuality, "BSC Partners sold most of its assets to a different company." *See* Dkt. No. 10 at 6 n.1. Accordingly, the amended complaint indicates that Plaintiff "acquired from BSC Partners the causes of action asserted in this action," with no mention of acquiring operating assets. *See* Dkt. No. 5 at ¶ 23. Plaintiff has stated elsewhere that it "only purchased the causes of action previously owned by Binghamton

---

[8] In fact, Plaintiff previously argued that "[Plaintiff] is in no way an agent of Binghamton Simulator under any principle of law," and that "[t]here is no basis for finding [Plaintiff] to be an alter ego of Binghamton Simulator." Dkt. No. 10 at 12.

Simulator." Dkt. No. 10 at 12. As such, the contention that Plaintiff's acquisition of this cause of action was incidental to its acquisition of BSC Partners' operating assets is contradicted by Plaintiff's own assertions.

In short, while Plaintiff contends that it did not acquire the claims for the sole purpose of litigating them, this contention is belied by the arrangement in which Kratos acquired BSC Partners' operating assets and Plaintiff acquired solely BSC Partners' causes of action. The District of Columbia District Court was confronted with a similar transaction in *Koro Co., Inc. v. Bristol-Myers Co.*, in which four individuals sold their corporation, Premo Pharmaceutical Laboratories, Inc. ("Premo"), to a third party. 569 F. Supp. 280, 282 (D.D.C. 1983). Pursuant to the stock purchase agreement governing the sale, Premo assigned its claims in a pending antitrust action to Koro, Inc. ("Koro"), a designee of two of Premo's original owners. *Id.* Premo voluntarily dismissed the pending antitrust action, and when Koro refiled the claims, the defendants moved for dismissal or summary judgment arguing, *inter alia*, that the assignment violated New York's champerty doctrine. *Id.* Applying New York law, the court found that the assignment was champertous because "the claim . . . was not assigned along with all of the other assets of [Premo] to [the purchaser]; instead, it was shunted aside to plaintiff, an entity completely unrelated to [the purchaser], and the assignment . . . was admittedly made solely to enable plaintiff to bring an action on this claim." *Id.* at 287. The court further explained,

> [Section 489] is . . . designed to prevent trafficking and speculation in lawsuits. In this case, there can be no doubt that the assignment was made in order to prosecute the claim on a speculative basis. The claim was split off from the other assets of [Premo], and [the Koros owners] were taking a chance on winning a windfall settlement or an award of damages.

*Id.* at 288. Likewise, the instant cause of action was carved out of Kratos's acquisition of BSC Partners' other assets to Plaintiff, an unrelated third party, to permit Plaintiff to prosecute this claim on a speculative basis.

Similarly, in *Justinian Capital SPC v. WestLB AG*, the Supreme Court, New York County, held that an assignment of an action to "a shell formed exclusively for the purposes of litigating the instant action," which did not purchase the debt instrument underlying the action, was champertous. 43 Misc. 3d 598, 606 (Sup. Ct. 2014). The court therefore dismissed the shell corporation's complaint, explaining that "it is champerty to sue . . . for debt that is not really your own. [This] is litigation by proxy and prohibited by section 489." *Id.* at 607. In the present matter, Plaintiff's representations have made clear that Plaintiff was formed as a shell corporation to permit the Matthews family to litigate this action. *See* Dkt. No. 17 at 5-6.

The Court agrees with the *Koros* and *Justinian* courts that such a transaction falls squarely within Section 489's prohibition on corporations speculating in lawsuits. In light of Plaintiff's assertions that it was created to enable the Matthews family to pursue the instant claims, and numerous contentions that it received this cause of action from BSC Partners absent any related obligations or assets, the Court concludes that Plaintiff's acquisition of this action violated the doctrine of champerty. Accordingly, Defendant's motion to dismiss the complaint on the ground of champerty is granted.

## C. Arbitration

Defendant moves in the alternative to compel arbitration pursuant to the Federal Arbitration Act. In light of the Court's determination that Plaintiff is barred from seeking relief, Defendant's motion to compel arbitration is denied as moot.

# IV. CONCLUSION

Having carefully reviewed the parties' submissions and the applicable law, and for the reasons contained herein, the Court hereby

**ORDERS** that Defendant's motion to dismiss the complaint is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion to compel arbitration is **DENIED as moot**; and the Court further

**ORDERS** that Plaintiff's complaint is dismissed; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  February 17, 2015
      Albany, New York

Mae A. D'Agostino
U.S. District Judge